ROBERT E. ATKINSON, ESQ., Bar No. 9958
Email:  robert@nv-lawfirm.com
**ATKINSON LAW ASSOCIATES LTD.**
8965 S Eastern Ave, Suite 260
Las Vegas, NV 89123
Telephone:  (702) 614-0600
Facsimile:  (702) 614-0647
*Attorney for Brian D. Shapiro, Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>    ALLA V KOSOVA,<br><br>                    Debtor. | Case No. 16-11907-led<br>Chapter 7<br><br>**TRUSTEE'S MOTION TO APPROVE (I)**<br>**SALE OF ESTATE ASSETS, AND (II)**<br>**SETTLEMENT AGREEMENT**<br><br>Hearing Date:    OST REQUESTED<br>Hearing Time:    OST REQUESTED |

   Chapter 7 trustee BRIAN D. SHAPIRO, by and through counsel, hereby moves this Court for an order approving the sale of the majority of the bankruptcy estate assets and also an embedded settlement, all in accordance with the terms of a certain Sale and Settlement Agreement between the above-captioned bankruptcy estate and a variety of other parties.

   This motion is based on:  the Memorandum of Points and Authorities contained herein; the pleadings and papers on file in this case; the attached exhibit; the contemporaneously-filed DECLARATION OF BRIAN D. SHAPIRO IN SUPPORT OF MOTION TO APPROVE SALE AND SETTLEMENT AGREEMENT ("*Trustee's Decl.*"); and any oral arguments made at the time of hearing on this matter.

DATED:  November 1, 2016    **ATKINSON LAW ASSOCIATES LTD.**

        By:  /s/ Robert Atkinson
         ROBERT E. ATKINSON, ESQ.
         Nevada Bar No. 9958
         *Attorney for Brian D. Shapiro, Trustee*

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.    BACKGROUND FACTS**

1.    On April 8, 2016 ("*Petition Date*"), debtor ALLA KOSOVA ("*Debtor*") filed for chapter 11 bankruptcy relief under Title 11 of the United States Code (the "*Bankruptcy Code*"), initiating this bankruptcy case (the "*Bankruptcy Case*") and creating the above-captioned bankruptcy estate (the "*Bankruptcy Estate*").  See DE #1.

2.    On August 16, 2016, an order was entered [DE #83] converting the Bankruptcy Case to one under chapter 7 of the Bankruptcy Code.

3.    Movant Brian D. Shapiro ("*Trustee*") is the appointed chapter 7 trustee of the Bankruptcy Estate.  See DE #85.

#### *A.  Overview*

4.    The Trustee has investigated the convoluted financial affairs of the Debtor, and has identified six major asset categories: (i) liquidated assets in his possession, (ii) certain insurance checks in his possession, (iii) the Debtor's real property, (iv) a construction defect claim relating to that real property, (v) certain non-exempt assets, and (vi) potential preferential or fraudulent transfers.  Trustee's Decl. at ¶ 5.  Each are discussed in more detail below.

5.    In addition, a dispute has arisen with the lender on the real property, which is the primary creditor of the Bankruptcy Estate, regarding its rights in certain property of the Bankruptcy Estate.  *Id.* at ¶ 6.

6.    By and through this motion and the written sale and settlement agreement attached hereto as **EXHIBIT 1** (the "*Agreement*"), all assets categories are addressed and the dispute with the lender is resolved.  The Agreement, which is contingent upon Bankruptcy Court approval, is a global resolution of all known open issues, other than the traditional duties of the Trustee relating to ongoing administration of the Bankruptcy Estate.  *Id.* at ¶ 7.

///

///

**B.  Liquidated Assets and the Insurance Checks**

7.      To date, the Trustee has liquidated and is in possession of a gross amount of $216,616.44 in funds (the "*Liquidated Assets*") (comprised of $205,616.44 obtained post-conversion from the bank accounts of the Debtor, plus an $11,000.00 check from a post-petition refund of attorney's fees), all of which (less any bank fees imposed) is currently held by the Bankruptcy Estate. *Id.* at ¶ 8.

8.      The Trustee is also in possession of three checks from State Farm totaling $465,827.77 (the "*SF Checks*"), arising from one or more pre-petition claims made by Debtor against State Farm (which, along with the SF Checks, are collectively hereinafter referred to as the "*SF Claim*"). *Id.* at ¶ 9.

9.      The parties to the Agreement have agreed that these two asset categories are property of the Bankruptcy Estate, which will retain and administer them in accordance with the terms of the Agreement (as discussed below). *Id.* at ¶ 10.

**C.  Real Property and the Construction Defect Suit**

10.     Debtor is the sole deed owner of residential real property located in Clark County, Nevada, and specifically APN 190-07-513-001, commonly known as 11 Anthem Pointe Court, Henderson NV 89052 (the "*Property*"). *Id.* at ¶ 11; see also Schedule A/B (DE #12 at pdf page 7).

11.     The Property is encumbered by a deed of trust recorded in the land records of Clark County, Nevada against the Property's parcel as instrument no 20050831-0006411 (the "*Deed of Trust*"). Trustee's Decl. at ¶ 12.

12.     A proof of claim relating to the Deed of Trust was filed by servicer CIT Bank, N.A. on behalf of creditor IndyMac Venture, LLC (collectively, the "*Bank*"). This proof of claim (claim #5 in the claims registry of this Bankruptcy Case) (the "*Bank's POC*") asserts a secured claim in the amount of $4,377,597.10 arising from non-payment on a certain promissory note (the "*Note*") which the Deed of Trust secures. *Id.* at ¶ 13; see also Proof of Claim #5.

13.     In addition, on the Petition Date, Debtor was plaintiff in a certain construction defect lawsuit filed in the Eighth Judicial District Court, Clark County Nevada as case no. A-

15-723888-D (the "*CD Lawsuit*").  The CD Lawsuit, which is still in progress, seeks substantial damages relating to a variety of construction defects relating to the construction of the Property.  Trustee's Decl. at ¶ 14.

14.    The Bank has agreed that the Trustee can short-sell the Property along with the CD Lawsuit to a single buyer, in accordance with the terms found in the Agreement.  *Id.* at ¶ 15.

### D.  Non-Exempt Assets and Potential Preferential or Fraudulent Transfers

15.    Based on his investigations into the financial affairs of the Debtor, the Trustee has reason to believe that some nonexempt assets, possibly including unscheduled assets, could be recovered and liquidated by the Bankruptcy Estate for the benefit of unsecured creditors.  *Id.* at ¶ 16.

16.    In addition, the Trustee has been investigating potential preferential payments pursuant to 11 U.S.C. §547, and also various potential fraudulent transfers pursuant to 11 U.S.C. §548 and other applicable state and Federal law.  Many of these potential transfers being investigated involve the Debtor's parents, Nellya Volostnykh ("*Nella*") and Valery Volostnykh ("*Valery*"), and also the Debtor's companies.  *Id.* at ¶ 17.

17.    The Trustee has agreed to sell both of these asset classes to a single buyer, in accordance with the terms found in the Agreement.

### E.  Dispute with Lender

18.    On September 15, 2016, the Trustee filed an application [DE #101] in this Bankruptcy Case (the "*Application to Employ*") seeking approval for the Trustee to employ Debtor's litigation counsel in the CD Lawsuit (the "*CD Attorneys*"), on substantially the same terms as they were employed by the Debtor in the CD Lawsuit.

19.    The Bank has communicated to the Trustee that it intends to object to the Application to Employ, asserting that the Bank has a security interest in all proceeds of the CD Lawsuit, or, in the alternative, that the Bank is the proper party-in-interest as plaintiff in that lawsuit (or can obtain proper party-in-interest status) by invoking a mandatory assignment clause contained in a rider to the Deed of Trust.  In addition, the Bank claims that

it has a security interest in, or right to assignment of, the SF Checks and/or the SF Claim. <u>Trustee's Decl.</u> at ¶ 19.

20.    The Trustee disputes the Bank's assertions, arguing that any security interest claimed by the Bank was not perfected in accordance with Nevada law; and furthermore arguing that the Bank cannot be assigned the claim because such assignment cannot be invoked post-petition.  <u>*Id.*</u> at ¶ 20.

21.    The hearing on the CD Lawsuit, originally set for October 18, 2016, has been continued to November 29, 2016 [DE #234] to provide time for the parties to see if the dispute could be settled.  The Trustee and the Bank have reached an agreement to settle their dispute, in accordance with the terms found in the Agreement, which also provides for a sale of the majority of the Bankruptcy Estate's assets.  <u>*Id.*</u> at ¶ 21.

## II.    TERMS OF THE SALE AND SETTLEMENT

22.    The parties to the Agreement are: the Bankruptcy Estate (by and through the Trustee); the Bank; the two asset buyers (NV Casa and Type P Management, LLC) (collectively, the "<u>*Buyers*</u>") and their principal; the Debtor and her companies; and Nellya and Valery (along with their companies).  <u>*Id.*</u> at ¶ 22; <u>see also</u> Exhibit 1.

23.    The principal of the two Buyers is a successful Texas businessman, Scott Laroque. Mr. Laroque does have a connection to Debtor; most notably, they live together in Austin. However, given the Agreement's global resolution of all matters (and the associated payment on unsecured claims), the close affiliation of Mr. Laroque with Debtor is not an issue for either the Trustee or the Bank.  Specifically, the Bank has agreed to: (i) divide its claim into secured and unsecured portions: (ii) **subordinate its unsecured portion to all other timely allowed general unsecured claims (allowing for a 100% payout of all known and anticipated non-Bank timely-filed allowed unsecured claims)**, and (iii) **the Bank has agreed to waive any portion of its unsecured claim that is not paid through the Trustee's distribution of assets (i.e., via the Trustee's Final Report)**.  <u>Trustee's Decl.</u> at ¶ 23; <u>see also</u> Exhibit 1.  In short, the Agreement provides for a global resolution of all assets and all claims in this Bankruptcy Case.

24.   The broad structure of the Agreement embeds a settlement of the Bank's dispute into the sale of assets, as follows:

- Bankruptcy Estate retains the Liquidated Assets.  All parties forgo all claims against them, and Debtor waives all exemptions thereto.

- Bankruptcy Estate retains the SF Claim (inclusive of the SF Checks), which is expected to be in the gross amount of $465,827.77.

  o 45% to Bank, as secured, paid 10 days after the SF Checks clear, or the effective date of the Agreement (whichever is later).

  o 45% to Laroque, as a §503(b) administrative claim, also paid 10 days after the SF Checks clear, or the effective date of the Agreement (whichever is later).

  o 10% to Bankruptcy Estate, for allowed unsecured claims, distributed through the TFR.

- Laroque provides $3.1 million new money into the estate, to purchase assets.

  o His company NV Casa buys the Property and the CD Lawsuit, for $2.7 million of the $3.1 million.  Bank gets the $2.7 million in satisfaction of its security interests in these assets.

  o His company Type P Management buys all other assets of the Bankruptcy Estate (other than the Property, the CD Lawsuit, the Liquidated Assets and the SF Claim), for the remaining $0.4 million, which is retained by the Bankruptcy Estate for allowed unsecured claims.

  o All sales are "as-is, where is" sale under 11 U.S.C. §363(b).

- To facilitate the sale and settlement, Debtor waives her discharge, pursuant to 11 U.S.C. §727(a)(10).

- Nellya and Valery agree to waive any and all claims against the Bankruptcy Estate and its assets, and shall not file any proofs of claim.

- The parties agree to stay matters (e.g., the Trustee ceases his discovery) pending the hearing on this motion

- The Agreement is entirely contingent upon Bankruptcy Court approval.

See Exhibit 1 for specific details and terms.

25.    The foregoing is merely a summary of certain of the material terms of the sale and settlement agreement and is qualified in its entirety by the Agreement itself, which contains many provisions, terms, and conditions.

### III.    LEGAL AUTHORITIES & ARGUMENT   [SALE]

26.    Section 363(b) of the Bankruptcy Code provides that a Trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  This provision generally allows for the sale property of the estate outside the ordinary course of business, subject to Court approval, where the proposed sale is a sound exercise of business judgment and when the sale is proposed in good faith and for fair value.  *In re Air Beds, Inc.*, 92 B.R. 419 (9th Cir. B.A.P. 1998).

27.    As described above (and in more detail in the Agreement itself), the four asset categories being sold are the Property, the CD Lawsuit claims, certain non-exempt assets, and potential preferential and/or fraudulent transfers.  The Trustee has investigated each of these asset categories, and, in his business judgment, assesses them as follows:

    a.  The Property is significantly upside-down on its loan.  The Bank's POC asserts a $4,377,597.10 secured claim (arising from the Deed of Trust), and the Trustee is in possession of a formal appraisal from a year ago (dated September 17, 2015) which appraises the Property, in as-is condition, at $2.1 million.  Trustee's Decl. at ¶ 24. Thus, no equity exists in the Property.  A traditional short-sale of the Property at that price, after realtor commissions, would net about **$2.0 million**, all of it secured.  *Id.*

    b.  The Trustee has visited the Property, which is vacant and in serious disrepair.  The disrepair appears to have arisen from a combination of property damage that gave rise to the SF Claim, and also from a variety of major construction defects (as alleged in the CD Lawsuit).  *Id.* at ¶ 25.   The Trustee has also investigated the CD Lawsuit, and has spoken with the CD Attorneys, and has been told that the CD Lawsuit, if it settles as currently expected, will net around **$0.7 million**.  *Id.*

c. The Trustee has investigated the non-exempt assets of the Bankruptcy Estate, and currently has reason to believe, based on investigations to date, that about **$0.1 million** (liquidation value) exists in non-exempt assets, exclusive of the Liquidated Assets and the SF Checks. *Id.* at ¶ 26.

d. The Trustee has investigated the potential preferential transfers and fraudulent transfers, and currently has reason to believe, based on investigations to date, that about **$0.3 million** in preferential and fraudulent transfers likely exist. *Id.* at ¶ 27.

28. The total of the above estimated values of these four asset categories is $3.1 million, and that is the sale price for them set in the Agreement. Accordingly, the Trustee asserts that the proposed sale of these assets is at fair value. *Id.* at ¶ 28.

29. Furthermore, the Trustee asserts that the proposed sale is made in good faith. Although the Buyers' principal has connections to the Debtor, the Bank has agreed to short-sell the Property to NV Casa, and so the overwhelmingly largest creditor in this case (and the secured creditor on the Property) approves of the proposed sale.[1] Furthermore, the proposed sale, which is being completed on an expedited basis, provides for quick sale of assets (the Property and the CD Lawsuit) that need attention paid to them. Also, as described above, the Trustee expects that this Agreement will result in 100% of all non-Bank timely allowed unsecured claims to be paid, and furthermore the Bank has agreed to waive any of its remaining unsecured claim that is not paid through distributions made in this Bankruptcy Case. In short, marketing the assets in an attempt to obtain a higher price would *solely* benefit the Bank, and the Bank is already agreeing to the terms of the Agreement. Hence, no marketing of the assets is required. *Id.* at ¶ 29.

30. The Trustee, in his business judgment, believes that: (i) that the terms of the sale, as set forth in the Agreement, constitute a fair and reasonable deal for the Bankruptcy Estate; and (ii) consummation of the sale of the property sold is in the best interest of the Bankruptcy Estate and the creditors. *Id.* at ¶ 30.

---

[1] A lender's "arms-length" requirement for a short sale is solely a matter of bank policy, not law. NRS §107.140 ("No provision of the laws of this State may be construed to require a sale in lieu of a foreclosure sale to be an arm's length transaction or to prohibit a sale in lieu of a foreclosure sale that is not an arm's length transaction.").

31.    For the reasons stated above, the proposed sales of the property should be approved as a sales being made in the Trustee's sound judgment and in good faith.  Accordingly, the Trustee also requests that the Court deem the sales to be made in good faith, and that the Buyers be afforded the protections found in 11 U.S.C. §363(m).  *Id.* at ¶ 31.

### A.   Relief Under Bankruptcy Rule 6004(h) Requested

32.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

33.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Bankruptcy Rule 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should 'order otherwise' and eliminate or reduce the 14-day stay, Collier on Bankruptcy suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy, § 6004.10 (15th rev.).

34.    **As a mandatory condition of the sale, the Buyers' principal has communicated to the Trustee an obligation that requires the sales to close on or before November 15, 2016**.  Trustee's Decl. at ¶ 32.  Even with the motion being heard on shortened time, the 14-day stay would interfere with closing.  Accordingly, the Trustee requests that the order waive the 14-day stay of Bankruptcy Rule 6004(h) and authorizing that the sale can immediately be consummated.

### IV.    LEGAL AUTHORITIES & ARGUMENT    [SETTLEMENT]

35.    Pursuant to Bankruptcy Rule 9019, the Court may approve a proposed compromise of a claim, after notice and a hearing.  Fed. R. Bankr. P. 9019(a).

36.    The Bankruptcy Court is afforded great latitude in approving compromise agreements.  However, the Court's discretion is not unlimited; compromises must also be fair and equitable.  *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 620 (9th Cir. 1988).  Such agreements must also be reasonable under the particular circumstances of

the case, and in the estate's best interests. *In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir., 2003).

37.    In reviewing proposed compromises, "courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (9th Cir. B.A.P. 1997); see also *In re Hyloft Inc.*, 451 B.R. 104, 109 (Bankr.Nev., 2011).

38.    In deciding whether to approve a proposed settlement, the bankruptcy court must make an informed decision; the court must independently make a finding that the compromise is reasonable, fair and equitable. *Hyloft* at 109.

39.    In determining the whether a proposed compromise is fair and reasonable, the Court should consider the following four factors (each, an "*A&C Factor*"):

> (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

> *A & C Properties* at 1381*; Woodson* at 620*; Mickey Thompson* at 420.

40.    Overall, the A&C Factors favor approval of the proposed compromise.  Each are analyzed below.

**B.  *Probability of Success in the Litigation***

41.    The dispute revolves around whether the Bank has a security interest in the claims and proceeds of the CD Lawsuit, or is entitled to be an assignee thereof, as a result of a term contained in a rider to the Deed of Trust.

**i.   Security Interest and Perfection**

42.    Specifically, the rider in question is a security agreement, and defines the collateral secured to include a variety of property, including "general intangibles".

43.    Under Nevada's version of the Uniform Commercial Code (NRS §104 *et seq.*), "general intangibles" is defined in Article 9 (Secured Transaction) as follows:

(pp) "General intangible" means any personal property, including things in action, …

NRS §104.9102(pp).

44.   A "thing in action", also known as a "chose in action", is property by which a party has not possession, but only the right to recover it by bringing an action (such as via a lawsuit). *Black's Law Dictionary* (online 2nd ed.). Moreover, "things in action" are personal property, not real property. NRS §10.045.

45.   It is undisputed that the Deed of Trust, along with the Rider, were recorded in the land records of Clark County, Nevada. However, the Trustee asserts that the Bank does not have a properly-perfected security interest in the CD Lawsuit, as follows: under Nevada law, a financing statement must be filed to perfect a security interest in personal property (including general intangibles), unless one of a limited number of exceptions apply. NRS §104.9310. None of those exceptions apply to general intangibles. *Id.* Although the Bank would argue that the recordation of the Deed of Trust in the land records of Clark County constitutes a sufficient filing, under Nevada law the office in which to file a financing statement for all collateral (other than real property, fixtures, and timber) is the Office of the Secretary of State. NRS §104.9501. In other words, the Trustee argues that perfection of the security interest in the personal property collateral contained in the rider required the filing of a UCC-1 with the Nevada Secretary of State. On information and belief, no such UCC-1 was ever filed. Trustee's Decl. at ¶ 33.

46.   The Trustee then argues that because the Bank did not perfect its security interest in the general intangibles collateral, then the Trustee steps ahead of the Bank with respect to this collateral, via application of the strong-arm statute of 11 U.S.C. §544. *Id.* at ¶ 34.

47.   Furthermore, if the Bank's security interest in this intangible asset were ever deemed to have been perfected, the Trustee would then argue that the perfection ceased, by operation of law, four months after the Debtor moved to Texas in mid-2014. NRS §104.9316 ("A security interest perfected pursuant to the law of the jurisdiction designated in subsection 1 of NRS 104.9301 or subsection 3 of NRS 104.9305 remains perfected until the earliest of:

(a)…; (b) The expiration of 4 months after a change of the debtor's location to another jurisdiction; …").  *Id.* at ¶ 35.

48.    Counterarguments to the Trustee's arguments do exist, but they rapidly devolve into arguing over whether perfection of non-fixture personal property can "tag along" with perfection of a security interest in real property, which is a morass of legal complexity.  *Id.* at ¶ 36.

### ii.  **Assignment**

49.    In the alternative, the Bank argues that it is an assignee of the claims in the CD Lawsuit, either by invocation of the mandatory assignment clause contained in the rider, or already is an assignee, by operation of law.  *Id.* at ¶ 37.

50.    The mandatory assignment clause in the Rider is as follows: "From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property."  *Id.* at ¶ 38.  It is agreed that the Bank, to date, has not made any such request for assignment.  *Id.*

51.    The Bank argues that it can invoke the clause against the Trustee, to which the Trustee demurs (arguing that the assignment is either a term that is personal to the Debtor and thus cannot be invoked against the Trustee, or, in the alternative, is an executory clause in the construction loan rider that was not assumed or assumable).  *Id.* at ¶ 39.

52.    The Bank alternatively argues that, by operation of law, it is automatically a pre-petition assignee (or otherwise could be deemed to be the proper party-in-interest, as Plaintiff in the CD Lawsuit), but the Trustee could not find any controlling case law on that assertion, especially when no pre-petition actions were taken by the Bank in the CD Lawsuit to assert such status.  *Id.* at ¶ 40.

### iii.  **SF Claim / SF Checks**

53.    The Bank also has a claim to the SF Checks (and, indirectly, the SF Claim), in that the SF Checks are made out to two payees: the Debtor and the Bank.  *Id.* at ¶ 41.  The same

arguments above apply to the SF Checks, in that the Bank asserts either a security interest in or assignment rights to those insurance proceeds, and the Trustee argues otherwise.

54.    To resolve and settle the Bank's asserted claim on the SF Checks, the Bank and the Trustee have agreed to split the proceeds of the SF Checks 45/45/10 (as previously discussed above), namely, 45% of the proceeds are deemed Bank-secured, 45% are granted to Laroque as an allowed §503(b) administrative claim (in recognition of his rights to insurance proceeds to repair the Property), and the remaining 10% is available to general unsecured claims (meaning that this 10% will ultimately be distributed to the Bank via its subordinated unsecured claim). *Id.* at ¶ 42.

### iv.  **Summary of First A&C Factor**

55.    For the reasons stated above, the Trustee therefore asserts that the first A&C Factor (probability of success in litigation) favors approval of the proposed settlement.  *Id.* at ¶ 43.

## C. *Difficulties in Collection*

56.    The second A&C Factor (difficulties in collections) is not a relevant factor, because the settlement does not involve payment by the Bank.  Rather, the matter being settled is the extent and breadth of the perfection of the Bank's security interest (or validity of its assignment rights).  Accordingly, nothing is being collected from the settling party.  *Id.* at ¶ 44.

## D. *Complexity, Expense, Delay, and Inconvenience of the Litigation*

57.    If this matter was contested, the relative expense, inconvenience, and delay would be considerable to all parties.

58.    The Property is vacant, and is in deteriorated condition, and it is best that it not be property of the Bankruptcy Estate for very long.  As for the CD Lawsuit, the Bank indicates that it will oppose the Application to Employ the CD Attorneys, which could get bogged down (either in briefing or in an appeal), and a protracted resolution would be detrimental to the prosecution of that lawsuit.  *Id.* at ¶ 45.

59. Moreover, the Trustee believes that monetization of the other two asset categories being sold (the non-exempt assets and the transfers) will be expensive, in terms of both discovery and in litigation costs, thereby reducing the net recovery to creditors. *Id.* at ¶ 46.

60. Adding to the complexity, Debtor has asserted in her amended schedules [DE #96] that her mother Nellya had a security interest in the CD Lawsuit, and subsequently clarified at her 341 hearing that Nellya had been assigned, pre-petition, all of Debtor's rights to and interest in the CD Lawsuit. Debtor also asserted in her amended SOFA [DE #98] and in her 341 hearing that a substantial portion of the Liquidated Assets were funds held in trust for Nellya. *Id.* at ¶ 47. These two amendments by Debtor are a massive overlay of complexity that are completely resolved via the Agreement, in which Nellya and Valery simply waive all claims against the Bankruptcy Estate and all of its assets.

61. Accordingly, the Trustee asserts that this third A&C Factor (complexity, expense, delay, and inconvenience of the litigation) favors approval of the settlement. *Id.* at ¶ 48.

### E.  Interests of the Creditors

62. The proposed settlement is in the best interests of the creditors because it maximizes the return to creditors.  If active, lengthy discovery and litigation occurs, then administrative costs will rise substantially, thereby reducing the net distribution to creditors. *Id.* at ¶ 49.

63. The settlement also represents an immediate payment that allows the Bankruptcy Estate to obtain quick recovery on assets, resulting in a quicker distribution to creditors. *Id.* at ¶ 50.

64. Furthermore, the Trustee has reason to believe that the Bank views the proposed settlement (as evidenced by the overall Agreement and the terms therein) as being favorable, in that it provides certain, quick monetization of a difficult asset (i.e., a great deal of uncertainty surrounds the Bank's primary alternative strategy, which would be to foreclose on the Property, which is in disrepair and the subject of a construction defect lawsuit). *Id.* at ¶ 51.

65.    Most importantly, as mentioned previously, the Trustee expects that the Agreement will result in 100% of all non-Bank timely-filed allowed unsecured claims to be paid, and furthermore the Bank has agreed to waive any of its remaining unsecured claim that is not paid through distributions made in this Bankruptcy Case.  Practically by definition, the proposed Agreement is therefore in the best interest of the creditors.  *Id.* at ¶ 52.

66.    For the above reasons, the Trustee asserts that the settlement is in the best interest of the creditors of the Bankruptcy Estate.  *Id.* at ¶ 53.

### F.  Conclusion re: Settlement

67.    For the reasons stated above, the Trustee, in his business judgment: (i) asserts that he has made an informed decision in entering into the Agreement; (ii) believes that the settlement (as evidenced by the Agreement) is fair, equitable, and reasonable; and (iii) believes that approval of the Agreement is in the best interests of the Bankruptcy Estate and its creditors.  *Id.* at ¶ 54.

### V.    RELIEF REQUESTED

68.    By this Motion, the Trustee seeks the entry of an order: (i) approving the Agreement in all respects; (ii) approval of the sale of assets to the Buyers, on the terms proposed in the Agreement; (iii) approval of the proposed settlement of the dispute with the Bank, deeming the settlement to be fair, equitable, and reasonable, and in the best interests of the Bankruptcy Estate and its creditors; (iv) deeming the sale of the assets to the Buyers to have been made in good faith, and therefore afforded the protections of 11 U.S.C. §363(m); and (v) waiving the 14-day stay of Bankruptcy Rule 6004(h) and deeming the sales to be completed upon the docketing of the order approving the Agreement.

# # # # #

DATED:  November 1, 2016                **ATKINSON LAW ASSOCIATES LTD.**

By: _____/s/ Robert Atkinson_____
ROBERT E. ATKINSON, ESQ.
Nevada Bar No. 9958
*Attorney for Brian D. Shapiro, Trustee*

-15-

**EXHIBIT 1**

**to**

**MOTION TO APPROVE**

## SALE AND SETTLEMENT AGREEMENT

This Sale and Settlement Agreement ("*Agreement*") is entered into by and between: THE BANKRUPTCY ESTATE OF ALLA V KOSOVA, Nevada Bankruptcy Case No. 16-11907-led (the "*Bankruptcy Estate*") by and through Chapter 7 Trustee Brian D. Shapiro ("*Trustee*"); Debtor ALLA V KOSOVA ("*Debtor*");  TKSC, LLC, a Nevada limited-liability company ("*TKSC*"); DATKSC, LLC, a Nevada limited-liability company ("*DATKSC*"); RARE FINDS, LLC, a Nevada limited-liability company ("*Rare Finds Nevada*); RARE FINDS, LLC, a Texas limited-liability company ("*Rare Finds Texas*"); NELLYA VOLOSTNYKH ("*Nellya*"); VALERY VOLOSTNYKH ("*Valery*"); individual SCOTT LAROQUE ("Laroque"); LFF HOLDINGS GROUP, LTD., a Texas corporation ("*LFF HOLDINGS*"); NV CASA DOMAIN, L.L.C., a Texas limited-liability company ("*NV Casa*"); TYPE P MANAGEMENT, L.L.C., a Texas limited-liability company ("*Type P Mgmt*"); and creditor INDYMAC VENTURE, LLC, a Delaware limited-liability company, along with its servicer CIT Bank, N.A. (collectively, the "*Bank*").  Each may hereinafter be referred to as a "Party," or collectively as the "Parties." Nellya and Valery are signing in both their respective individual capacities, and also all companies of which either or both of them are members, majority owners, directors, or otherwise control 50% or more of the voting equity (collectively in all such capacities, "*Debtor's Parents*").  NV Casa and Type P Mgmt are collectively referred to herein as the "*Buyers*."

## RECITALS

WHEREAS, on April 8, 2016, the Debtor filed a voluntary petition for bankruptcy relief under chapter 11 of the Bankruptcy Code (Title 11 of the United States Code), initiating bankruptcy case no. 16-11907-led (the "*Bankruptcy Case*") and thereby creating the Bankruptcy Estate;

WHEREAS, on August 16, 2016, an order was entered (DE #83) converting the Bankruptcy Case to one under Chapter 7 of the Bankruptcy Code;

WHEREAS, Trustee is the appointed Chapter 7 Trustee of the Bankruptcy Estate;

WHEREAS, to date the Trustee has liquidated and is in possession of a gross amount of $216,616.44 in funds (the "*Liquidated Assets*") (comprised of $205,616.44 obtained post-conversion from the bank accounts of the Debtor, plus an $11,000.00 check obtained post-conversion from a post-petition refund of attorney's fees), all of which (less any bank fees imposed) is currently held by the Bankruptcy Estate;

WHEREAS, the Trustee expects to be receiving, or has received, three checks from State Farm totaling $465,827.77 (the "*SF Checks*") at the time of the execution of this Agreement, arising from one or more pre-petition claims made by Debtor against State Farm (which, along with the SF Checks, are collectively hereinafter referred to as the "*SF Claim*");

WHEREAS, the Trustee, in his investigations into the financial affairs of the Debtor, has alleged that he has reason to believe that a substantial amount of nonexempt assets could be recovered and liquidated by the Bankruptcy Estate for the benefit of unsecured creditors, including potential unscheduled assets, recovery of potential preferential payments pursuant to 11 U.S.C. §547, and also recovery of potential fraudulent transfers pursuant to 11 U.S.C. §548

and other applicable state and Federal law;

WHEREAS, Debtor is the sole deed owner of residential real property located in Clark County, Nevada, and specifically APN 190-07-513-001, commonly known as 11 Anthem Pointe Court, Henderson NV 89052 (the "*Property*");

WHEREAS, the Property is encumbered by a deed of trust recorded in the land records of Clark County, Nevada against the Property's parcel as instrument no 20050831-0006411 (the "*Deed of Trust*");

WHEREAS, the Bank has filed a proof of claim, numbered 5 in the claims registry of this Bankruptcy Case (the "*Bank's POC*"), in which is asserted a secured claim in the amount of $4,377,597.10 arising from non-payment on a certain promissory note (the "*Note*") which the Deed of Trust secures;

WHEREAS, on the Petition Date, Debtor was plaintiff in a certain construction defect lawsuit relating to the Property, filed in the Eighth Judicial District Court, Clark County Nevada as case no. A-15-723888-D (the "*CD Lawsuit*");

WHEREAS, on September 15, 2016, the Trustee filed an application [DE #101] in this Bankruptcy Case (the "*Application to Employ*") seeking approval for the Trustee to employ Debtor's litigation counsel in the CD Lawsuit (the "*CD Attorneys*"), on substantially the same terms as they were employed by the Debtor in the CD Lawsuit;

WHEREAS, the Bank intends to object to the Application to Employ, asserting that the Bank has a security interest in all proceeds of the CD Lawsuit, or, in addition or in the alternative, that the Bank is the proper party-in-interest as plaintiff in that lawsuit, or can obtain proper party-in-interest status by invoking a mandatory assignment clause contained in a rider to the Deed of Trust;

WHEREAS, the Trustee disputes the Bank's assertions with respect to the CD Lawsuit, arguing that any security interest claimed by the Bank was not perfected in accordance with Nevada law; and furthermore arguing that the Bank cannot be assigned the claim because such assignment cannot be invoked post-petition;

WHEREAS, the Bank and the Trustee wish to settle and compromise their dispute relating to the CD Lawsuit;

WHEREAS, the Bank has agreed that the Trustee may short-sale the Property to buyer NV Casa, on the terms contained herein, including a subordination of its remaining unsecured claim;

WHEREAS, the Bank and the Trustee have agreed that the CD Lawsuit, and all the claims therein and all the proceeds that may arise therefrom, can be also sold along with the Property to buyer NV Casa, on the terms contained herein;

WHEREAS, NV Casa desires to purchase the Property along with the CD Lawsuit (and all proceeds thereof), on the terms contained herein;

WHEREAS, Type P Mgmt desires to purchase all other nonexempt property of the Bankruptcy Estate, known and unknown (except for and excluding the Liquidated Assets and the SF Claim, which the Trustee shall retain), on the terms contained herein;

WHEREAS, the Debtor's amended Schedule D [DE #96] identifies Nellya as having a security interest in the CD Lawsuit, which the Debtor subsequently testified to actually being an assignment of claims, instead of a security interest;

WHEREAS, the Debtor's amended Statement of Financial Affairs separately identifies Nellya as having transferred $170,000.00 to Debtor in the past (the "*Transferred Money*");

WHEREAS, Nellya and Valery agree to waive any and all claims whatsoever that they may have against the Bankruptcy Estate, including, but not limited to, any and all claims they may have relating to the CD Lawsuit, and all claims to the Transferred Money;

WHEREAS, to facilitate the settlement and sale contemplated herein, Debtor has agreed (without any admissions and intended by her solely for the purpose of facilitation) to waive her bankruptcy discharge and also all claims of exemption in property of the Bankruptcy Estate; and

WHEREAS, the Parties have reviewed their respective claims and defenses, and believe it is in the best interest of those involved to settle and resolve all disputes between them and consummate the sale of assets as described herein, and the Parties wish to do so freely and voluntarily, after having had the opportunity to seek the advice of independent counsel with full knowledge of the binding and conclusive nature thereof;

NOW, THEREFORE, in consideration of the promises, covenants, warranties, and representations set forth herein, each of the Parties, without any admission of wrongdoing by any of them, agree as follows:

1. **Recitals**. As a condition of this Agreement, the Parties agree that all of the foregoing Recitals are true and correct. The foregoing Recitals are incorporated herein by such reference and made a part of this Agreement. If this Agreement is executed but ultimately deemed null and void or not approved by the Bankruptcy Court, the Recitals are not binding admissions on the Parties.

2. **Contingent on Bankruptcy Court Approval**. The Parties acknowledge that this Agreement, and all obligations and releases contained herein, are contingent upon Bankruptcy Court approval. The Trustee shall prepare and file a motion to obtain such approval (the "*Motion to Approve*") on shortened time, seeking a hearing on or prior to November 8, 2016; however, the Parties understand that the request for shortened time is ultimately at the Bankruptcy Court's availability and discretion. All Parties hereto agree not to directly or indirectly oppose the Motion to Approve, or appeal any order granting the Motion to Approve. If the Bankruptcy Court does not approve this Agreement, then this Agreement, and all of the obligations and releases contained herein, are null and void.

3. **Effective Date**. In the Motion to Approve, the Trustee shall request a waiver of the 14-day stay otherwise imposed under Bankruptcy Rule 6004(h). If so waived, then

Settlement Agreement - Page | 3

the effective date of this Agreement (the "*Effective Date*") shall be the date when any Bankruptcy Court order approving this Agreement is docketed. If the Court does not waive the stay, then the Effective Date shall be 15 calendar days after entry of the order approving this Agreement. All obligations and releases contained herein shall become effective only on the Effective Date. All Parties hereto agree not to appeal or file a motion to stay any order approving this Agreement.

4.    **Retention of Liquidated Assets and SF Claim by the Bankruptcy Estate.** All Parties hereby agree that the gross $216,616.44 of Liquidated Assets is property of the Bankruptcy Estate, and shall be available (net of any bank fees imposed) for distribution to allowed administrative and general unsecured claims in this Bankruptcy Case. Debtor waives, now and forever, all claims of exemption in the Liquidated Assets, and any future amendment that may be made to Debtor's Schedule C to the contrary shall be null and void. Debtor and Debtor's Parents waive, now and forever, any and all claims that any portion of the Liquidated Assets were, are, or arose from either the Transferred Money or were funds held in trust by the Debtor, and any claim filed or asserted otherwise in this Bankruptcy Case shall be null and void.

All Parties also hereby agree that the SF Claim (which, as defined above, is inclusive of the SF Checks) is property of the Bankruptcy Estate. Debtor waives, now and forever, all claims of exemption in the SF Claim, and any future amendment that may be made to Debtor's Schedule C to the contrary shall be null and void.

5.    **Sale of All Other Bankruptcy Estate Assets.** The Bankruptcy Estate shall sell all of its interests in all other Bankruptcy Estate property, other than the Liquidated Assets and the SF Claim, to the Buyers for a total of $3,100,000.00 (the "*Purchase Price*"), on the following terms:

(a)    *Assets Sold, Allocation of Purchase Price, and Classification.* The assets being sold (the "*Purchased Assets*")[1] are all of the Bankruptcy Estate's interest in:

| Asset | Buyer | Allocation of Purchase Price | Classification |
|---|---|---|---|
| The Property (11 Anthem Point Ct, Las Vegas NV) | NV Casa | $2,600,000.00 [2] | Secured by DOT |
| The CD Lawsuit (Nevada Eighth District Court case no. A-15-723888-D) | NV Casa | $100,000.00 | Secured by DOT |
| All other non-exempt property of the | Type P Mgmt | $400,000.00 | Unsecured |

---

[1]  The Motion to Approve shall, in addition to seeking approval of this Agreement pursuant to Bankruptcy Rule 9019 request authorization to sell the Purchased Assets to Buyers on an as-is basis pursuant to 11 U.S.C. §363(b), and furthermore shall request that Buyers each be deemed a good-faith purchaser for the purposes of 11 U.S.C. §363(m).

[2]  For the purpose of any Bankruptcy Estate tax return filed by the Trustee, the Debtor hereby represents that the original cost basis for the Property is in excess of $4 million, and therefore Debtor, the Trustee, and the Bank acknowledge and agree that the sale of the Property and CD Lawsuit contemplated herein is being sold by the Bankruptcy Estate to NV Casa at a loss.

| Bankruptcy Estate (excluding the Liquidated Assets and the SF Claim), plus all claims against third parties held by the Bankruptcy Estate against any person or entity (including but not limited to all preference claims under 11 U.S.C. §547, and all fraudulent transfer claims under 11 U.S.C. §548 and other applicable state and Federal law) | | | |
| --- | --- | --- | --- |
| | **TOTAL** | **$3,100,000.00** | |

(b)      *Transfer of Purchase Price to Trustee.*  At the time of Buyers' execution of this Agreement, Laroque shall cause his counsel to wire transfer the Purchase Price funds to the bank account of the Bankruptcy Estate.  The Trustee shall hold these funds in trust until the hearing on the Motion to Approve, and continuation or appeal thereof.  The Purchase Price shall remain the sole property of Laroque until such time as the Motion to Approve is granted and the Effective Date is reached.  Only on the Effective Date (as defined herein) shall the funds representing the Purchase Price be property of the Bankruptcy Estate, and the asset sale contemplated herein shall be consummated (as described in subsections (e), (f), and (g) below), and neither Laroque nor the Buyers shall thenceforth have any further claim to the Purchase Price funds, the same being irrevocably conveyed to the Bankruptcy Estate.  If, for any reason, the Bankruptcy Court does not approve this Agreement, then the Trustee shall, in the order denying the Motion to Approve, seek authorization to wire the Purchase Price funds (they still being the sole property of Laroque and it being expressly agreed herein that no party shall ever acquire any interest in or claim to such funds unless the Motion to Approve is approved as set forth herein) back to Laroque's counsel within three business days of docketing of that order denying the Motion to Approve.

(c)      *Execution of Documents by Trustee in Anticipation of Consummation of Sale.*  At least two business days prior to the hearing on the Motion to Approve, the Trustee shall execute two documents: (1) a quitclaim deed of the Property to NV Casa, in a form substantially shown in EXHIBIT A attached hereto (the "*Quitclaim Deed*"); and (2) an assignment of the Bankruptcy Estate's interest in the CD Lawsuit in a form substantially shown in EXHIBIT B attached hereto (the "*Assignment of Claim*"), both of which shall be held in trust by the Trustee or his counsel pending the hearing on the Motion to Approve. [If, for any reason, the Bankruptcy Court does not approve this Agreement, then the Quitclaim Deed and the Assignment of Claim shall be of no force and effect.]

(d)      *Execution of Documents by Bank in Anticipation of Consummation of Sale.*  At least two business days prior to the hearing on the Motion to Approve, the Bank shall cause an authorized person to execute a full reconveyance of the Deed of Trust in a form substantially shown in EXHIBIT C attached hereto (the "*Reconveyance of DOT*"), which shall be held in trust by the Bank's counsel pending the hearing on the Motion to Approve. [If, for any reason, the Bankruptcy Court does not approve this Agreement, then the Reconveyance of DOT shall be of no force and effect.]

(e)      *Consummation of Sale of the Real Property Upon Effective Date.*  On the Effective Date, the sale to NV Casa of the Bankruptcy Estate's interest in the Property shall be deemed complete.  Consummation of that sale shall be as follows:

- The Trustee shall, within one business day of the Effective Date, provide a scan of the executed Quitclaim Deed to Laroque's counsel, with the original to be sent by runner or by first-class mail or overnight delivery to Laroque's Las Vegas counsel, as to be agreed between the parties.
- The Trustee shall, within one business day of the Effective Date, wire $2.6 million to the trust account of the Bank's counsel. The Trustee shall ensure that the order granting the Motion to Approve specifically authorizes this transfer of funds to the Bank to consummate the sale, upon the Effective Date.
- Within one business day of the clearing of the $2.7 million in funds ($2.6 million for the sale of the Property as set forth in this paragraph and $100,000 for the assignment of interest in the CD Lawsuit as set forth in paragraph 5(f) below), the Bank's counsel shall provide a scan of the executed Reconveyance of DOT to Laroque's counsel, with the original to be sent by overnight delivery to Laroque's Las Vegas counsel.
- NV Casa shall be responsible for recording the Quitclaim Deed and paying all real property transfer taxes associated therewith.
- Failure of either the Trustee or the Bank's Counsel to consummate the sale of the Property as described above shall constitute just cause for any Party to file an emergency motion to compel consummation.

(f)    *Consummation of Assignment of CD Lawsuit Upon Effective Date.* On the Effective Date, the assignment to NV Casa of the Bankruptcy Estate's interest in the CD Lawsuit shall be deemed complete. Consummation of that assignment shall be as follows:

- The Trustee shall, within one business day of the Effective Date, provide a pdf scan of the executed Assignment of Claim to Laroque's counsel, with the original to be sent by runner or by first-class mail or overnight delivery to Laroque's Las Vegas counsel, as to be agreed between the parties.
- The Trustee shall, within one business day of the Effective Date, wire $100,000.00 to the trust account of the Bank's counsel. The Trustee shall ensure that the order granting the Motion to Approve specifically authorizes this transfer of funds to the Bank to consummate the assignment, upon the Effective Date.
- NV Casa shall be responsible for all noticing of change of Plaintiff in the CD Lawsuit.
- NV Casa shall be responsible for all of the legal fees and costs incurred to date by the CD Attorneys, and shall not have (or file any document seeking approval of) any claim (including

any administrative claim) against the Bankruptcy Estate for any fees or costs incurred by the CD Attorneys prior to or during the pendency of this Bankruptcy Case.

- The Trustee shall ensure that ensure that the order granting the Motion to Approve acts as a withdrawal of the Application to Employ the CD Attorneys (DE #101), effective upon the Effective Date.

- Failure of the Trustee to consummate the assignment as described above shall constitute just cause for any Party to file an emergency motion to compel consummation.

(g)   *Consummation of Sale of All Other Assets.*  On the Effective Date, the sale to Type P Mgmt of all other property of the Bankruptcy Estate (except for the Liquidated Assets, and the SF Claim) shall be deemed complete and consummated upon entry of the order approving this Agreement.  Furthermore:

- The Trustee shall, upon demand by Type P Mgmt (or its counsel), provide a Bill of Sale evidencing the sale of these assets.  Any such Bill of Sale shall only describe the assets sold in general terms and not identify any particular property,  i.e., "any and all right, title and interest in non-exempt assets of the Bankruptcy Estate" and "all of the Bankruptcy Estate's claims (each,  a  "*Claim*") and causes of action (each,  a  "*Cause of Action*") that may exist against any person or entity, including, without limitation, potential avoidance action claims under sections 544, 547, 548, and 550 of the Bankruptcy Code, and state law avoidance claims." [3]

---

[3] The assets being sold shall include all of the following:  All claims recoverable under Section 550 of the Bankruptcy Code, all claims held by the Bankruptcy Estate against third parties, and all other claims of any kind or character whatsoever owed to or in favor of the Debtor or the Bankruptcy Estate, to the extent not specifically released pursuant to this Agreement, are hereby preserved and retained for enforcement by Type P Mgmt subsequent to the Effective Date. Nothing in this Agreement shall act as a bar as it relates to any claims against third parties, except as expressly released pursuant to the Agreement. Nothing in this Agreement shall estop Type P Mgmt from asserting claims against third parties.  Such claims shall be preserved for the benefit of Type P Mgmt and to the extent any such claims are pursued and any recovery made thereon it shall flow to Type P Mgmt.  The Claims and Causes of Action being conveyed include:  Any and all saleable claims, causes of action, cross claims or counterclaims held or assertable by the Bankruptcy Estate, including but not limited to: (i) any claim or cause of action under a policy of liability insurance or otherwise; (ii) a Cause of Action; and (iii) to the extent not included in the term Cause of Action, any and all claims, causes of action, counterclaims, demands, controversies, against third parties on account of costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, and executions of any nature, type, or description which the Bankruptcy Estate has or may come to have, including, but not limited to, negligence, gross negligence, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies (both civil and criminal), racketeering activities, securities and antitrust violations, tying arrangements, deceptive trade practices, breach or abuse of fiduciary duty, breach of any alleged special

- After the Effective Date, Type P Mgmt, at its own expense, may proceed as claimant in any action arising from a purchased claim, in the place and stead of the Bankruptcy Estate or the Trustee (as applicable), whether such proceeding occurs in the Bankruptcy Court or in any other forum. Any such recoveries that may be obtained by Type P Mgmt in the monetization of these claims shall be the sole property of Type P Mgmt, or any subsequent assignee thereof.

(h)     *All Sales on As-Is, Where-Is Basis.*  Laroque and the two Buyers represent that they have performed adequate due diligence on the Purchased Assets, and have been provided an opportunity to review the claims in the CD Lawsuit, as well as any associated expert reports therein.  They further represent that they are aware that Debtor's Parents may have a latent, patent, or commingled ownership or other interest in some of the Debtor's non-exempt assets that comprise some of the Purchased Assets, and may have a claim (via assignment or security interest) to the CD Lawsuit or the proceeds thereof.  Laroque and the two Buyers hereby waive any remaining due diligence on all of the Purchased Assets and also waive all seller disclosures on the Purchased Assets.   Laroque and the two Buyers agree that once this Agreement is signed by all Parties hereto, there is no due diligence period and the Buyers' commitment to purchase the Purchased Assets is irrevocable (contingent only upon Bankruptcy Court approval) and furthermore that sale of the Purchased Assets is deemed complete as of the Effective Date.  Laroque and the two Buyers specifically acknowledge and understand that the Purchased Assets are being sold to the Buyers on an as-is-where is basis pursuant to 11 U.S.C. §363(b), and that the Trustee is in the process of performing discovery on non-exempt assets and potential recoveries, and that, after the Effective Date, the Buyers will be responsible for any further investigation of and monetization of all Purchased Assets, and all costs for doing so.

(i)     *Indemnification of Bankruptcy Estate for a Scheduled Claim.*  As a material incentive to inducing the Bankruptcy Estate and the Bank to enter into this Agreement: (i) Laroque represents and warrants that the potential claimants scheduled by Debtor as "Steve Trettin" [DE #24] and "MDM Properties c/o Steve Trettin" [DE #96] are the same claim and that this claim is being separately settled by Laroque; and (ii) Laroque hereby indemnifies the Bankruptcy Estate for any allowed claim that may be filed in this Bankruptcy Case by either MDM Properties or Steve Trettin.

---

relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, at law or in equity, in contract or in tort, or otherwise, known or unknown, suspected or unsuspected, except as otherwise released herein. It is the intent of the Bankruptcy Estate that this list of claims sold shall be as broad as permitted by applicable law and shall include all claims, whether or not disclosed in the Debtor's Schedules filed in this case.  Nothing shall estop Type P Mgmt from asserting claims or causes of action just because they were not scheduled.  Such claims shall be transferred to Type P Mgmt.  The assets being sold to Type P Mgmt include all equity in the Debtor's 2014 Lexus RX 350 [VIN: 2T2BK1BAXEC236792] and both Type P Mgmt and Debtor agree that title thereto shall be issued or assigned to Scott Laroque (or any entity that he may so designate).



Settlement Agreement -  Page | 8

6.    **Settlement Between Bank and Bankruptcy Estate**.  To settle, resolve, and compromise the disputes between the Bank and the Trustee, the Parties agree as follows:

- The Bank's $4,377,597.10 claim against the Bankruptcy Estate shall be treated and allowed as follows:
  - Relating to the $3.1 million Purchase Price, the Bank shall have an allowed secured claim of $2,700,000.00;
  - Relating to the SF Claim, the Bank shall have an allowed secured claim equal to 45% of gross proceeds realized therefrom (the "*Bank's SF Secured Claim*"); and
  - The bank shall have an allowed unsecured claim (hereinafter the "*Bank's Unsecured Claim*") for the remainder of its $4,377,597.10 claim that is not secured as per above.  For all purposes in this Bankruptcy Case, the Bank's Unsecured Claim shall be deemed to be liquidated.

- The Bank's Unsecured Claim shall be subordinated to all allowed administrative claims and all allowed and timely-filed general unsecured claims.  However, the Bank's Unsecured Claim shall be superior in priority to any tardily-filed, allowed general unsecured claim.

- All Parties hereto agree not to object to the Bank's POC, or to its allowance and treatment pursuant to the above terms, for any reason.

In addition, the Bank agrees as follows:

- The Bank agrees never to pursue any damages or the deficiency on the Note or file any complaint seeking any damages or deficiency judgment on the Note as against any of the Parties to this Agreement.

- The Bank agrees that it is monetizing its claim only by and through the Bankruptcy Case.  The Bank shall be paid on the Bank's Unsecured Claim only via distributions to unsecured creditors, as part of the Trustee's normal administration of the Bankruptcy Estate, and any unpaid balance on that unsecured claim after distributions are made shall be deemed waived in full as against all persons and entities, whether parties to this Agreement or otherwise.

With respect to the SF Claim, all Parties agree as follows:

- Bank agrees that the Trustee can endorse the SF Checks on behalf of the Bank, prior to depositing them into the Bankruptcy Estate's bank account, and furthermore agrees to sign a stipulation to this effect.

- If the SF Checks are cannot be deposited or for any reason need to be reissued prior to deposit, then all Parties agree to cooperate to promptly get State Farm to reissue new checks (either in the Trustee's name, or, alternatively, reissued as is with the existing payee names),

and also to cooperate in any and all other ways that may be required for the Trustee to monetize the SF Claim.

- NV Casa shall have an allowed administrative claim (the "*NV Casa Admin Claim*"), pursuant to 11 U.S.C. §503(b), equal to 45% of the gross proceeds realized from the SF Claim.

- 10% of the gross proceeds of the SF Claim shall be available (net of any bank fees imposed) for distribution to allowed administrative and general unsecured claims in this Bankruptcy Case.

- In the Motion to Approve, the Trustee shall seek Court approval for permission to pay both the NV Casa Admin Claim and the Bank's SF Secured Claim, in full without any further Court order required, on the later of: (i) 10 calendar days after the SF Checks clear the Bankruptcy Estate's trust account; or (ii) the Effective Date.

7.    **Debtor's Waiver of Discharge and all Claims of Exemption**.    To facilitate the settlement and sale contemplated herein, Debtor shall waive her bankruptcy discharge. Debtor shall do so by signing the waiver attached hereto as EXHIBIT D at the time of execution by her of this Agreement, and her counsel shall transfer that original signed waiver to the Trustee within two business days, to be received by the Trustee prior to the hearing on the Motion to Approve.   The Trustee shall hold that waiver in trust pending approval of this Agreement, and may only file it on the docket of this Bankruptcy Case after the Effective Date. Upon filing the waiver after the Effective Date, the Trustee will file an *ex parte* motion seeking Court approval of that waiver pursuant to 11 U.S.C. §727(a)(10), and all Parties hereto agree not to oppose that *ex parte* motion.

Furthermore, as of the Effective Date, Debtor hereby also waives any and all claims of exemption that she may have, under any applicable law, in: (i) all of her real and personal property, whether tangible or intangible, whether scheduled or unscheduled, that existed as of the Petition Date; and (ii) any claim of exemption that may arise pursuant to 11 U.S.C. §522(g) (or other applicable law) in any property that may subsequently be recovered by the Trustee or Type P Mgmt.   As of the Effective Date, this blanket waiver of all exemptions overrides and supersedes all prior Schedule C forms (as amended) that have ever been filed by the Debtor in this Bankruptcy Case. Any future amendment to the Debtor's Schedule C shall be null and void. Debtor understands that the legal effect of this section is that all property of the Bankruptcy Estate, other than the Liquidated Assets and the SF Claim, are being purchased by the Buyers.

8.    **Cessation of Discovery by Trustee**. To facilitate the settlement and sale contemplated herein, the Trustee shall temporarily cease outbound discovery at the time all Parties execute this Agreement (including cessation of review of any documents that may be received in the future in response to previously-issued discovery requests), until the time for hearing on the Motion to Approve. In particular:

(a)    With respect to the following Subpoenas for Request for Production of Documents, for which no or only partial responses have been received to date, the Trustee agrees to not file any motion to compel, all Parties reserve all rights to file motions to quash or motions for protective orders, and preserve any and all objections to these subpoenas,

the scope of these subpoenas, and the propriety of these subpoenas, and the Trustee also agrees to continue the due date for production, as follows:

| Subpoena for Documents issued to: | New due date for production: |
|---|---|
| Terrance Kwiatkowski (2 subpoenas) | November 18, 2016 |
| Debtor (5 subpoenas) | November 18, 2016 |
| Nellya Volostnykh | November 18, 2016 |
| Valery Volostnykh | November 18, 2016 |
| Bank of Nevada (2 subpoenas) | November 23, 2016 |
| American Express (2 subpoenas) | November 28, 2016 |
| Attorney Realty Alliance / Ron Klug (2) | November 18, 2016 |

(b)    On the Effective Date, the subpoenas identified in subsection (a) above, along with any and all other subpoenas for the production of documents that may still be outstanding, shall be deemed withdrawn and of no further force or effect, and the party to whom the subpoena had been issued shall no longer be under any obligation to produce documents. Any documents produced by such third parties shall be retained by the Trustee (and his counsel) in his files, and subject to any further use of production after the Effective Date only by agreement of all parties to this Agreement, by subpoena, or by court order.

(c)    Upon signing of this Agreement by all Parties, the following Subpoenas to Appear for Rule 2004 Examination shall be deemed immediately withdrawn, without prejudice:

- Terrance Kwiatkowski
- Nellya Volostnykh
- Valery Volostnykh
- Jehna Ryland
- Tyler Corbridge
- Ronald Klug

(d)    Upon signing of this Agreement by all Parties, the Trustee shall temporarily cease discovery upon, and shall not issue any further subpoenas (whether for production of documents or for a Rule 2004 examination or otherwise) to any person or entity, including but not limited to:

- Scott Laroque
- SCAGTASK, LLC
- Medical Diagnostics Management Services, LLC
- Any other company owned or controlled by Scott Laroque
- Any company owned or controlled by Debtor
- Any company owned or controlled by Nellya or Valery
- Any company managed by Jehna Ryland
- Triple 7 Movers
- Craters and Freighters
- Kyle Wartenberg
- Tristen Wartenberg
- Debtor



Settlement Agreement -  Page | 11

(e)    If for any reason the Bankruptcy Court does not approve this Agreement at the hearing on the Motion to Approve, then the temporary cessation of discovery by the Trustee described above shall terminate, and the Trustee may resume all discovery. In addition, if for any reason the Bankruptcy Court does not approve this Agreement at the hearing on the Motion to Approve, then all Parties hereto reserve all rights to file motions to quash or motions for protective orders, and preserve any and all objections to the subpoenas, the scope of the subpoenas, and the propriety of the subpoenas, including, but not limited to, the subpoenas served upon Bank of Nevada.

(f)    By previous stipulation (DE #198) and order approving the same (DE #221) (collectively, the "*Stipulation to Continue 341*"), the Trustee had agreed to continue the Section 341 creditor's meeting to November 10, 2016, at 8:00 a.m. PST. If the Effective Date occurs prior to that date, then the Trustee shall conclude the continued 341 meeting at that time as an asset case, and no testimony will be required by the Debtor. If the initial hearing on the Motion to Approve occurs after that date, or if the Court approves this Agreement but the Effective Date is anticipated to be after November 10, 2016, then the Trustee shall continue the 341 meeting to a date and time after the anticipated Effective Date. If for any reason the Bankruptcy Court does not approve this Agreement at the hearing on the Motion to Approve, then the 341 meeting shall proceed as planned, and the Debtor's presence shall be required, as per the terms contained in the Stipulation to Continue 341.

9.    **Waiver of Claims by Debtor and Insiders**. On the Effective Date, the Debtor and also certain other Parties [Debtor's Parents, TKSC, DATKSC, Rare Finds (Nevada), and Rare Finds (Texas) (collectively, the "*Insiders*")] hereby each agree to waive all claims that each Party has, or may have, including all known and unknown pre-petition and post-petition claims (including secured claims, unsecured claims, administrative claims, or otherwise) against the Bankruptcy Estate (and the Trustee). Debtor and each of the Insiders agree not to file a proof of claim in the Bankruptcy Estate, or to file a motion or pleading asserting any claim against the Bankruptcy Estate. Any proof of claim or administrative claim filed by Debtor or any Insider (whether on behalf of themselves or for any other person or entity) shall be null and void *ab initio*.

10.    **Waiver of Claims by Laroque and Affiliates**. On the Effective Date, Scott Laroque, LFF Holdings, and the Buyers (collectively, the "*Laroque Affiliates*") hereby each agree to waive all claims that each Party has, or may have, including any and all pre-petition and post-petition claims that may exist (including secured claims, unsecured claims, administrative claims, or otherwise) against the Bankruptcy Estate (and the Trustee). Each of the Laroque Affiliates agree not to file a proof of claim in the Bankruptcy Estate, or to file a motion or pleading asserting any claim against the Bankruptcy Estate. Any proof of claim or administrative claim filed by any of these Parties shall be null and void *ab initio*. The Laroque Affiliates retain all rights to enforce this Agreement and any documents attendant thereto once approved by the Court.

11.    **Mutual Limited Release of Laroque Parties**. On the Effective Date, the Bankruptcy Estate and all Parties hereto absolutely and forever releases, acquits and discharges Scott Laroque along with all companies which he owns or controls (including but not limited to SCAGTASK, LLC, LFF Holdings, and the Buyers) (collectively, the "*Laroque Releasees*"),

from any and all potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which the Bankruptcy Estate and the Parties now hold, or ever have held, whether at law or in equity, against the Laroque Releasees. The Laroque Releasees also release the Bankruptcy Estate (along with the Trustee and his counsel) and the Bank from any and all potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which they now hold (if any), or ever have held, whether at law or in equity.

12. **Mutual Limited Release of Bank**. On the Effective Date, the Bankruptcy Estate and all Parties hereto absolutely and forever releases, acquits and discharges the Bank, along with all of its employees, managers, servicers, agents, and attorneys (collectively, the "*Bank Releasees*"), from any and all potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which the Bankruptcy Estate and the Parties now hold, or ever have held, whether at law or in equity, against the Bank Releasees, and in particular from any and all claims and causes of action that may exist relating to the Note, the Deed of Trust, the underlying loan and all documents relating thereto (collectively, the "*Loan*"), and the origination, servicing, and special servicing thereof. On the Effective Date, the Bank Releasees similarly release the Bankruptcy Estate (along with the Trustee and his counsel) from any and all potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which they now hold (if any), or ever have held, whether at law or in equity, *except for* the Bank's POC (including all amendments), which shall specifically survive this release. It is the intent of the Parties that the Bank's $4,377,597.10 claim against the Bankruptcy Estate, as evidenced by the Bank's POC, survives this release. The term "Bank Releasees" specifically includes the Bank's predecessors-in-interest on the Loan (including the Note and the Deed of Trust).

13. **Mutual Limited Release of Debtor**. On the Effective Date, after the sale of property to Type P Mgmt is consummated, the Bankruptcy Estate and the Trustee absolutely and forever releases and acquits Debtor from any and all remaining potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which the Trustee and Bankruptcy Estate may still retain against Debtor by operation of law (i.e., non-saleable claims) after the sale to Type P Mgmt of all other property of the Bankruptcy Estate (except for the Liquidated Assets and the SF Claim). On the Effective Date, the Debtor releases the Bankruptcy Estate (along with the Trustee and his counsel) from any and all potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which she now holds (if any), or ever has held, whether at law or in equity. Notwithstanding anything herein to the contrary, the releases in this section are effective only if the Debtor's original signed waiver of discharge is provided to the Trustee prior to the hearing on the Motion to Approve, as contemplated in Section 7 above.

14. **Mutual Limited Release of Nellya and Valery**. On the Effective Date, after the sale of property to Type P Mgmt is consummated, the Bankruptcy Estate and the Trustee absolutely and forever release and acquit Nellya and Valery from any and all remaining potential or actual claims, including, but not limited to, fraudulent transfer claims under the Bankruptcy Code or the Uniform Fraudulent Transfer Act under NRS Chapter 112, and the avoidance thereof under 11 U.S.C. § 550, causes of action, derivative claims, and claims for attorneys' fees and costs, which the Trustee and Bankruptcy Estate may still retain against Nellya and Valery by operation of law (i.e., non-saleable claims) after the sale to Type P Mgmt

of all other property of the Bankruptcy Estate (except for the Liquidated Assets and the SF Claim). On the Effective Date, Nellya and Valery release the Bankruptcy Estate (along with the Trustee and his counsel) from any and all potential or actual claims, causes of action, derivative claims, and claims for attorneys' fees and costs, which they now hold (if any), or ever have held, whether at law or in equity.

15.    **Effect of Limited Releases**.  When they become effective, the limited releases found in Sections 11, 12, 13, and 14 above shall <u>not</u>: (i) release any term of this Agreement or any affirmative obligations of any Party contained herein; or (ii) release or limit any future ability or right of any Party to enforce this Agreement.

16.    **Not a General Release**.  Notwithstanding anything to the contrary contained in this Agreement, all Parties understand and agree that the Bankruptcy Estate is not releasing any claims that it may have against any person or entity, other than the limited releases identified above. Type P Mgmt is purchasing all such claims, and may pursue those claims in the place and stead of the Trustee, in Type P Mgmt's sole discretion and own expense.

17.    **Attorneys' Fees**.  With respect to all matters in the Bankruptcy Case, each Party shall bear its own attorneys' fees and costs.

18.    **Governing Law; Jurisdiction**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. The U.S. Bankruptcy Court, District of Nevada shall retain jurisdiction over performance of, enforcement of, or any disputes arising from or related to, this Agreement.

19.    **Authority**.  Each Party hereby represents, warrants and covenants that the undersigned signatories for such Party have the full legal right, power and authority to bind that Party.

20.    **Representation**.  Each of the Parties represent that they have received independent legal advice, or have had the opportunity to receive independent legal advice, with respect to the terms of and advisability of executing this Agreement.

21.    **Severability**.  This Agreement shall be enforced to the maximum extent permitted by law. In the event that any one or more of the phrases, sentences, sections, or paragraphs contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having competent jurisdiction, or shall be or become invalid or unenforceable by virtue of any applicable law, the remainder of this Agreement shall be construed as if such phrases, sentences, sections, paragraphs or sections had not been inserted except when such construction shall constitute a substantial deviation from the general intent and purposes of the Parties as reflected in this Agreement. In the event any material or substantive terms are revised, deleted or replaced, then all Parties to this Agreement may agree to such alterations but, failing an agreement of all parties to such alterations, then this Agreement shall fail and become null and void.

Settlement Agreement - Page | 14

22.   **Entire Agreement**.  This Agreement embodies the entire agreement and understanding by and between these three groups (each, a "*Group*"): (i) the Bankruptcy Estate and the Trustee; (ii) the Bank; and (iii) (collectively as a group) Laroque, the Buyers, the Debtor, and the Insiders.  This Agreement supersedes any and all prior or concurrent agreements, understandings, statements, assurances, assumptions, premises, promises, agreements, discussions or representations, oral or written, relating to the foregoing matters, including oral agreements or representations, if any.  No Group has made any representations upon which any other Group has relied that are not contained in this Agreement relating to the foregoing matters.  No Group is relying on an unstated assumption, premise or condition not contained in this Agreement relating to the foregoing matters.

23.   **No Modification, Waiver, or Amendment**.  No modification, waiver, or amendment of any of the terms of this Agreement shall be valid unless in writing and executed by all Parties and approved by the Bankruptcy Court. No waiver of any breach hereof or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar or dissimilar nature. No course of dealing or course of conduct shall be effective to amend, modify or change any provision of this Agreement.

24.   **Counterparts**.  The Parties agree that this Agreement may be executed in counterparts, and may furthermore be executed by a Party on a scan of a counterpart executed by another Party.  The Parties agree to cause their counsel to retain the originals of signed counterparts until 15 days after the Effective Date, after which they may be disposed of without notice.

25.   **Assignment**.  No Party other than the Bank and the Buyers may transfer or assign any of its rights, remedies or obligations under this Agreement.  The Buyers may freely assign their rights hereunder, but must do so prior to the hearing on the Motion to Approve and provide notice by email to the Trustee (and his counsel) of doing so.  After the Effective Date and the consummation of the respective sales of the assets, the Buyers may freely assign their interest in any or all Purchased Assets to any person or entity, without notice to any Party hereunder.

26.   **Successors**.  This Agreement shall be binding upon and inure to the benefit of the Parties and to their successors-in-interest.  In particular, all terms of this Agreement shall be binding, in perpetuity, upon any successor-in-interest to the Bank for the Loan (inclusive of the Note, Deed of Trust, and all related loan documents).

27.   **Further Assurances**.  The Parties shall take, or cause to be taken, all actions and shall do, or cause to be done, all things necessary, proper or advisable to consummate each of the agreements, promises, covenants, and obligations of such Party under this Agreement.

28.   **No Third Party Beneficiaries**.  This Agreement shall not confer any rights or remedies on any person or entity other than the Parties and their respective successors and assigns.

# # # # #

***AGREED:***

**THE BANKRUPTCY ESTATE OF ALLA V KOSOVA:**

Brian D. Shapiro, *in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Alla V Kosova, Nevada Bankruptcy Case No. 16-11907-led*

**DEBTOR:**

_____
Alla V. Kosova, *an individual, and debtor in Nevada Bankruptcy Case No. 16-11907-led*

**TKSC, LLC, a Nevada limited-liability company:**

By: _____
       Alla V. Kosova, *member*

**DATKSC, LLC, a Nevada limited-liability company:**

By: _____
       Alla V. Kosova, *member*

**RARE FINDS, LLC, a Nevada limited-liability company:**

By: _____
       Alla V. Kosova, *member*

**RARE FINDS, LLC, a Texas limited-liability company:**

By: _____
       Alla V. Kosova, *member*

Settlement Agreement -  Page | 16

# # # # #

*AGREED:*

**THE BANKRUPTCY ESTATE OF ALLA V KOSOVA:**

_____

Brian D. Shapiro, *in his capacity as Chapter 7 Trustee of the Bankruptcy Estate
of Alla V Kosova, Nevada Bankruptcy Case No. 16-11907-led*

**DEBTOR:**

_____

Alla V. Kosova, *an individual, and debtor in Nevada Bankruptcy Case No. 16-11907-led*

**TKSC, LLC, a Nevada limited-liability company:**

By: _____
Alla V. Kosova, *member*

**DATKSC, LLC, a Nevada limited-liability company:**

By: _____
Alla V. Kosova, *member*

**RARE FINDS, LLC, a Nevada limited-liability company:**

By: _____
Alla V. Kosova, *member*

**RARE FINDS, LLC, a Texas limited-liability company:**

By: _____
Alla V. Kosova, *member*

Settlement Agreement - Page | 16

**DEBTOR'S PARENTS (individually and on behalf of all businesses that either or both of them are members of, majority owners of, directors of, or otherwise control :**

_____

Nellya Volostnykh

_____

Valery Volostnykh

**SCOTT LAROQUE:**

_____

Scott Laroque, *an individual*

**LFF HOLDINGS GROUP, LTD., a Texas corporation**

By:    _____
       Scott Laroque, *President*

**NV CASA DOMAIN, L.L.C., a Texas limited-liability company**

By:    _____
       Scott Laroque, *President*

**TYPE P MANAGEMENT, L.L.C., a Texas limited-liability company**

By:    _____
       Scott Laroque, *President*

**INDYMAC VENTURE, LLC, a Delaware limited-liability company**

By:    CIT Bank, N.A.
Its:   Servicer

       By:    *Jessie Caldwell*

       Title: *Director*

       Its:   *N/A*

Settlement Agreement - Page | 17

**DEBTOR'S PARENTS (individually and on behalf of all businesses that either or both of them are members of, majority owners of, directors of, or otherwise control :**

_____          _____
Nellya Volostnykh                              Valery Volostnykh


**SCOTT LAROQUE:**

_Scott Laroque, an individual_


**LFF HOLDINGS GROUP, LTD., a Texas corporation**

By:     
Scott Laroque, _President_


**NV CASA DOMAIN, L.L.C., a Texas limited-liability company**

By:     
Scott Laroque, _President_


**TYPE P MANAGEMENT, L.L.C., a Texas limited-liability company**

By:     
Scott Laroque, _President_


**INDYMAC VENTURE, LLC, a Delaware limited-liability company**

By:     CIT Bank, N.A.
Its:     Servicer

          By:     _____

          Title:  _____

          Its:    _____


Settlement Agreement -  Page | 17

**DEBTOR'S PARENTS** (individually and on behalf of all businesses that either or both of them are members of, majority owners of, directors of, or otherwise control :

_Nellya A. V_

Nellya Volostnykh

_Valery Volostnykh_

Valery Volostnykh

**SCOTT LAROQUE:**

_____

Scott Laroque, *an individual*

**LFF HOLDINGS GROUP, LTD., a Texas corporation**

By: _____

Scott Laroque, *President*

**NV CASA DOMAIN, L.L.C., a Texas limited-liability company**

By: _____

Scott Laroque, *President*

**TYPE P MANAGEMENT, L.L.C., a Texas limited-liability company**

By: _____

Scott Laroque, *President*

**INDYMAC VENTURE, LLC, a Delaware limited-liability company**

By: *CIT Bank, N.A.*
Its: *Servicer*

By: _____

Title: _____

Its: _____

# EXHIBIT A:

## Form of

## QUITCLAIM DEED

APN: 190-07-513-001

Return document and mail tax statements to:

    NV Casa Domain, L.L.C.
    3502 Paesanos Parkway, Suite 100
    Shavano Park, TX 78231

# QUITCLAIM DEED

THIS INDENTURE WITNESSETH: That first party

    **BANKRUPTCY ESTATE OF ALLA V. KOSOVA**, Nevada bankruptcy case no. 16-11907-led

does hereby convey, release, and quitclaim to:

    **NV CASA DOMAIN, L.L.C.**, a Texas limited liability company

the real property situated in the County of Clark, State of Nevada, described as follows:

    LOT SEVENTEEN (17) IN BLOCK ONE (1) OF AMENDED PLAT OF A PORTION
    OF ANTHEM COUNTRY CLUB PARCEL 32, AS SHOWN BY MAP THEREOF ON
    FILE IN BOOK 87 OF PLATS, PAGE 31, IN THE OFFICE OF THE COUNTY
    RECORDER OF CLARK COUNTY, NEVADA.

and commonly known as 11 Anthem Pointe Court, Henderson Nevada 89052.

Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining.  Subject to: property taxes, liens, conditions, covenants, restrictions, reservations, rights, rights of way, and easements now of record.

By: _____
    Brian D. Shapiro, *Authorized Signatory*

STATE OF NEVADA    )
COUNTY OF CLARK    )

This instrument was acknowledged before me

on _____, 2016, by: <u>Brian D. Shapiro</u>.

_____
    NOTARY PUBLIC

# EXHIBIT B:

# Form of

# ASSIGNMENT OF CLAIM

# ASSIGNMENT OF CLAIMS

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Brian D. Shapiro, the Chapter 7 Trustee (in such capacity, "Trustee" or "Assignor") for the Bankruptcy Estate of Alla V. Kosova (Nevada Bankruptcy Case no. 16-11907-led), does herby sell, transfer, convey and assign unto Type P Management, L.L.C., a Texas limited liability company ("Type P Mgmt") all of Assignor's right title and interest in and to any and all claims, demands, causes of action arising within, out of, or connected in any way with the Plaintiff's complaint (as amended) in the construction defect lawsuit known as case no. A-15-723888-D pending before the Eighth Judicial District Court, Clark County, Nevada (the "Lawsuit").

This Assignment is executed and given pursuant to the certain Sale and Settlement Agreement by and among the Assignor, Type P Mgmt, and the additional signatories thereto.

The assignment made by the Trustee in this Assignment of Claims is made without warranty or representation with respect to the validity or collectability of the claims asserted in the Lawsuit.

Dated this _____ day of November, 2016.

Assignor:

_____

Brian D. Shapiro, *in his capacity as Chapter 7 Trustee of the Bankruptcy Estate of Alla V Kosova, Nevada Bankruptcy Case No. 16-11907-led*

# EXHIBIT C:

## Form of

## RECONVEYANCE OF DOT

APN: 190-07-513-001

WHEN RECORDED MAIL TO:

NBS Default Services, LLC
301 E. Ocean Blvd. Suite 1720
Long Beach, CA 90802

# FULL RECONVEYANCE

Property Address: 11 Anthem Pointe Court, Henderson Nevada 89052

NBS Default Services, LLC, Trustee under that certain Deed of Trust executed by DANNY J. WARTENBERG AND ALLA V. WARTENBERG, HUSBAND AND WIFE AS JOINT TENANTS, Trustors, recorded on August 31, 2005 in Book 20050831 as Document No. 0006411 of Official Records in the office of the County Recorder of Clark County, State of Nevada, having been requested by the holder of the obligation secured by said Deed of Trust, to reconvey the estate granted to trustee under said Deed of Trust, DOES HEREBY RECONVEY to the person or persons legally entitled thereto, without warranty, all the estate, title, and interest now held by Trustee under said Deed of Trust.

TRUSTEE: NBS Default Services, LLC

By: _____
Kim Coker

STATE OF CALIFORNIA          )
COUNTY OF LOS ANGELES        )

On _____, before me, _____ Notary Public, personally appeared Kim Coker, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature^) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC

# EXHIBIT D:

## Form of

## WAIVER OF DISCHARGE

ROBERT E. ATKINSON, ESQ., Bar No. 9958
Email: robert@nv-lawfirm.com
**ATKINSON LAW ASSOCIATES LTD.**
8965 S Eastern Ave, Suite 260
Las Vegas, NV 89123
Telephone: (702) 614-0600
Facsimile: (702) 614-0600
*Attorney for Brian D. Shapiro, Trustee*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>ALLA V KOSOVA,<br><br>Debtor. | Case No. 16-11907-led<br>Chapter 7<br><br>**DEBTOR ALLA V. KOSOVA'S**<br>**WAIVER OF DISCHARGE**<br>**PURSUANT TO 11 U.S.C. §727(a)(10)** |

ALLA V. KOSOVA, being duly sworn, deposes and says:

      1.     I am the debtor in this bankruptcy case.

      2.     Pursuant to 11 U.S.C. §727(a)(10), I am hereby waiving my discharge. I am doing so voluntarily, and in accordance with the terms and conditions of a certain Sale and Settlement Agreement (Exhibit 1 to DE # ____), which I signed of my own free will.

      3.     I understand that this waiver means that I will not receive a discharge in this bankruptcy case. I make this waiver knowingly, having had the opportunity to discuss and consult with my counsel the implications of this waiver and a denial of discharge.

*Further your affiant sayeth naught.*

 

                        _____
                        Alla V. Kosova, *Debtor*

STATE OF TEXAS     )
COUNTY OF TRAVIS    )

This affidavit was acknowledged before me on _____, 2016 by ALLA V. KOSOVA.

_____
NOTARY PUBLIC